UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HERCULES PHARMACEUTICALS, INC., | Civil Action No.: 24-cv-5659 |
| *Plaintiff*, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| BRANT CHERNE, | |
| *Defendant*. | |

Plaintiff Hercules Pharmaceuticals, Inc. ("Plaintiff" or "Hercules"), by and through its attorneys, Tarter Krinsky & Drogin LLP, as and for its Complaint against Defendant, Brant Cherne ("Defendant" or "Brant"), alleges as follows:

## NATURE OF ACTION

1.      This is an action by Plaintiff for preliminary and permanent injunctive relief, as well as compensatory, consequential, punitive damages and legal fees, arising from Defendant's misappropriation of Plaintiff's confidential business information and trade secrets to unfairly compete against Plaintiff in the biopharmaceutical and life sciences industry, Defendant's breach of post-employment contractual obligations to Plaintiff, and Defendant's breaches of his fiduciary duties while employed by Plaintiff.

2.      Defendant is a former employee who resigned on August 1, 2024, and has already commenced employment with NDC Distributors LLC ("NDC"), located at 4 Corporate Drive, Suite D, Cranberry, New Jersey 08512, a direct competitor of Plaintiff, working on matters that compete directly with the business of Plaintiff, in abject breach of Defendant's contractual obligations to Plaintiff, including his confidentiality obligations and his 12-month non-compete and non-solicitation obligations.

3.     Defendant's actions constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq*., ("DTSA"), and the State of New York common law. Among other things, Plaintiff's investigation revealed that, shortly before he announced his resignation, Defendant emailed confidential and extremely sensitive business data from his email account with Plaintiff to a private email account, which could only be for the purpose of illicitly using such information in his new competitive employment. Defendant's actions also amount to abject violations of his contractual and fiduciary duties to Plaintiff.

4.     Plaintiff will suffer irreparable harm if the Defendant's actions are not immediately and permanently enjoined from the use and misappropriation of the confidential and proprietary business information and trade secrets of Plaintiff. Accordingly, Plaintiff seeks immediate injunctive relief and appropriate remedies in law and equity for Defendant's unlawful and harmful conduct.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331, in that it is a civil action involving a federal question under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the state law claims as they arise from the same nucleus of operative facts as the federal claim. *See* 28 U.S.C. § 1367.

6.     Venue is proper in this judicial district because: (a) Defendant explicitly agreed that any dispute or claim arising out of or resulting from his employment agreement with Hercules "shall be brought only in any state or federal court located in the state of New York, county of Nassau," (b) Plaintiff's principal place of business is located within Nassau County, and (c) a substantial part of the events out of which Plaintiff's claims arise occurred in this county.

**THE PARTIES**

7.     Hercules is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 27 Seaview Boulevard, Port Washington, Nassau County, New York 11050.

8.     Hercules is a nationally licensed and accredited pharmaceutical product wholesaler conducting business in the State of New York and throughout the United States.

9.     Upon information and belief, at all relevant times, Brant was and is an individual residing in the County of Nassau.

**FACTS COMMON TO ALL CAUSES OF ACTION**

**Background**

10.     Hercules is a New York corporation with its headquarters and principal place of business in Port Washington, New York. It was formed in 2010. Along with its corporate affiliates Hercules employs approximately 100 individuals.

11.     Hercules is a nationally licensed pharmaceutical wholesale distributor accredited by the National Association of Boards of Pharmacy. A pharmaceutical wholesale distributor sources drugs from manufacturers approved by the FDA in large volumes and sells them to entities licensed to dispense those drugs, such as community pharmacies, or entities authorized to administer them, such as infusion centers. Hercules serves community-based pharmacies (known as "retail pharmacies"), specialty pharmacies, doctors, hospitals and institutions.

12.     The marketplace in which Hercules competes is heavily regulated and dominated by three major "Fortune 15" competitors: AmerisourceBergen, Cardinal Health, and McKesson. Together these "Big Three" control over 98% of the wholesale distribution market in the United States, owning 33%, 28%, and 37% of the market, respectively. To survive, smaller entities such

3

as Hercules must devise and implement strategies that enable them to gain modest competitive advantages. It is these strategies and know-how that differentiate Hercules from its larger, comparable, and smaller competitors. A competitor's acquisition and use of these strategies and the know-how at issue in this lawsuit are a direct and material threat to Hercules' business and enterprise value.

13.     To compete, Hercules identifies hard-to-find opportunities in the marketplace and, through a series of carefully developed models, methods and analytics, it has been able to erode some of the Big Three's market share. As critically relevant here, these are what differentiate Hercules from its smaller and peer competitors.

14.     More specifically, Hercules has devised a business system that: (i) identifies for its customers purchasing opportunities not apparent from publicly available information, and; (ii) maximizes those purchasing opportunities to achieve the greatest profit margin. For one example, it can be thought of this way: If 95% of a customer's business is, by contract, relegated to the Big Three, Hercules guides customers to achieve maximum profitability from the remaining five percent. The Defendant has been trained and has utilized these methods for more than six years.

15.     As another example, Hercules' research has proven successful at predicting trends, outcomes and breakthroughs in the specialty drug market. Customers trust Hercules for this ability to place them "ahead of the market", and the mechanics of this predictive strategy have been imparted to Brant.

16.     As another example, some pharmaceuticals are designated by the FDA as subject to their "Risk Evaluation and Mitigation Strategies" ("REMS") program. This generally involves specialty drugs with special risks and, thus, additional requirements attendant to ensure their safety and efficacy. Manufacturers of REMS-designated drugs often operate special compliance

4

programs to ensure that those drugs are monitored and used appropriately by patients, physicians, and pharmacists.

17.     One prominent example is lenalidomide, a drug closely related to thalidomide. Lenalidomide is an effective therapeutic but can be fetotoxic or cause birth defects. Hercules' success in lenalidomide depends on intricate and carefully calibrated strategies involving significant cross-division coordination. Before his resignation from Hercules and breach of contract, Brant had participation in, access to and awareness of many of those strategies, as was necessary for him to successfully engage customers purchasing Lenalidomide.

18.     In short, this is far more complex than simply finding customers and selling them products. Hercules' know-how would be of incredible value to its competitors.

**Defendant's Role as Director of Business Development and Employment by a Competitor**

19.     Brant became employed by Hercules in June 2018. At the time, he had absolutely no experience in healthcare or in the pharmaceutical industry. He brought no knowledge, experience, or business to the table.

20.     By July 2024 he was a Director of Business Development ("DBD") and for 2023 his annual compensation was over $700,000.

21.     In that role, Brant reported directly to the Hercules' CEO, Sara Amani ("Amani"), and to Hercules' President, Tim Ward ("Ward"). Brant functioned horizontally throughout Hercules' core business leadership team.

22.     On August 1, 2024, Brant abruptly resigned and has become employed by NDC Distributors ("NDC"). Its website shows its address as 4 Corporate Drive, Suite D, Cranberry, New Jersey 08512. *See* https://ndcdrug.com/.

23.     NDC is a direct competitor of Hercules and, therefore, Brant's employment is of great concern to Hercules.

24.     Brant's role, and knowledge of Hercules' most valuable confidential business information cannot be overstated, and it presents an enormous opportunity for a competitor like NDC to gain an unfair competitive advantage by usurping the information and know-how Hercules has developed since 2010.

25.     During his employment, his ascent through senior management, and at the time of his resignation, Brant was exposed to the most critical and confidential aspects of Hercules' operations, including sales policies, procedures, technology, marketing strategies, know-how and supplier and product pipelines. Colloquially, he knows the ingredients and recipe of the "special sauce."

26.     DBDs have an especially important role in identifying competitive strategic information and understanding and communicating business ideas to customers. They are trained in what to look for when assessing a customer and what information to obtain. DBDs are specifically trained in how to use Hercules' competitive strategies. Brant himself was essentially given "a masterclass" in Hercules' proprietary strategies and skills sets regarding the complex pharmaceutical marketplace and complex regulations. This included access to and use of customer information that Hercules accumulated over many years.

27.     DBDs' interaction with customers also includes explaining Hercules' product offerings, including new products. This is especially important for pharmaceuticals, which have complex life cycles and dynamics, such as with brand/generic substitution laws. The role of DBD's is explained more fully below.

28.     DBDs like Brant regularly coordinate complex business negotiations that require interdepartmental involvement with management, legal, pricing, and operational departments. Thus, they know the business inside and out. This is also coupled with daily and weekly meetings with senior leadership, including Amani, on proprietary business strategies.

29.     Hercules made substantial investments in Brant's professional development, including participation in conferences, trade shows, and high-level meetings with suppliers and customers, all of which paved the way for his advancement within the company. Over the years, Ward spent months traveling exclusively, one-on-one, with Brant to business meetings supporting his upskilling and deeply educating him in this complex industry and how Hercules bettered its competitors on identifying, selecting and targeting opportunities.

30.     As part of his job, Brant attended private meetings with customers, prospects, and manufacturers to obtain business using Hercules' unique strategies. Much more than a mere "salesperson," Brant went after business opportunities using the models and tactics that differentiate Hercules from its competitors.

31.     Brant was a customer-facing representative for Hercules with a portfolio of accounts including retail and specialty pharmacies, hospitals and health systems with training in, access to, and participation in implementing Hercules' strategies, tactics, and methodologies.

**Brant's Contract**

32.     Brant signed a confidentiality agreement at time of hire, superseded in 2022 by the one at issue in this case. On or about April 21, 2022, he executed the Employee Confidentiality and Non-Compete Agreement ("Contract"). This is the same agreement signed by the other four DBDs.

33.     The Contract contains three provisions relevant now: (a) a 12-month non-compete; (b) a covenant not to disclose or use confidential information or trade secrets, and; (c) a 12-month restriction on soliciting customers.

34.     With emphasis added, Section 3(c) of the Contract provides in relevant part:

i.      Because of Employer's legitimate business interest as described herein and the good and valuable consideration, including the pharmaceutical industry knowledge, salary, and monetary benefits from employment, offered to the Employee, the receipt and sufficiency of which is acknowledged, during the term of Employee's employment and for the period beginning on the last day of the Employee's employment with the Employer and continuing for <u>twelve (12) months thereafter</u>, ...  <u>the Employee agrees and covenants not to engage in any Prohibited Activity; provided, however, that with respect to trade secrets, the Employee shall hold and keep secret and confidential such trade secrets for so long as they remain trade secrets under applicable law</u>. Employee acknowledges that he will have access to proprietary information as Director of Business Development and agrees that he will not use this information to engage in a Prohibited Activity.

ii.     For purposes of this non-compete clause, "Prohibited Activity" is activity in which the Employee contributes their knowledge (whether directly or indirectly, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity) to an entity engaged in any business that competes with Employer, by selling any product or service sold by Employer. Prohibited Activity also includes activity that may require or inevitably require disclosure of Confidential Information.

* * *

35. With emphasis added, Section 3(e) of the Contract provides in relevant part:

i.      The Employee understands and acknowledges that the Employer has expended and continues to expend significant time and expense in developing customer relationships, customer information and goodwill, and that because of the

8

Employee's experience with and relationship to the Employer, he will have access to and learn about much or all of the Employer's Customer Information (as defined herein). "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

ii.     The Employee understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm to the Employer.

iii.     The Employee agrees and covenants, during the period beginning on the last day of the Employee's employment with the Employer and <u>continuing for twelve (12) months thereafter, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of communication, or meet with the Employer's current customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Employer</u>. This restriction shall only apply to each of the following:

1. Customers or prospective customers the Employee contacted in any way during the twelve (12) months before the last day of the Employee's employment.
2. Customers about whom the Employee has trade secret or Confidential Information.
3. Customers who became customers during the Employee's employment.
4. Customers about whom the Employee has information that is not available publicly.

**NDC as a Competitor and Hercules' Information**

36.     There can be no serious or good-faith dispute that NDC is a direct competitor of Hercules. Under the U.S. Food, Drug and Cosmetics Act both Hercules and NDC are pharmaceutical wholesale distributors. The FDA's Wholesale Distributor Directory identifies

Hercules and NDC as pharmaceutical "wholesale distributors" with the same state regulators and licensure. Upon information and belief, NDC (like Hercules) also distributes generic drugs.

37.     Upon further information and belief, NDC solicits business from <u>retail and specialty pharmacies</u>. This is significant. As the name implies, "specialty pharmacies" dispense "specialty drugs." These are of the type that your typical local or chain pharmacy does not stock or sell. A significant portion of Hercules' customers and leads are retail and specialty pharmacies; and these are a major portion of the market in which Brant focused. This is important because Brant's knowledge exists in both retail and specialty.

38.     When Brant resigned, informed Hercules that his new position was limited to "retail" only and would be working on the "buy side," perhaps to reduce concerns. This does not matter. First, his Contract prohibits it. Second, it seems to be false.

39.     As Hercules later learned, Brant has been hired not only for NDC's retail business, but also to launch them into the specialty pharmacy division and is financially incentivized to do so.

40.     Specialty pharmacies make up the largest percentage of Hercules' revenue, and even on the retail side Brant had all of Hercules' largest customers. Enabling him to open that sector for NDC effectively catapults them into a business sector in which they do not currently operate and enables NDC to acquire and use Hercules' confidential information and know-how to do so.

41.     Nor can there be any serious or good-faith dispute that the unique strategies developed and used by Hercules, that were both imparted to and used by Brant during his employment, are protectable interests, either under terms of the Contract or New York's common law as either trade secrets, confidential information, or competitive know-how.

42.     Brant had access to and utilized the following (non-exclusive) list of Hercules' confidential commercial information and trade secrets:

- Portions of proprietary compliance programs and protocols;
- Training on those programs and protocols, including Hercules' proprietary, in-house REMS compliance programs;
- Methodologies and strategies to use in synthesizing supplier-facing and customer-facing commercial strategies to generate sales;
- Market strategy know-how, in a highly complex marketplace;
- Cross divisional trade strategy know-how;
- The identities of customer leads and prospects; strategic initiatives and plans for targeting same; market research and intelligence;
- Customer usages, i.e., demand, differentiated by different drug products, and tracked over time;
- Confidential communications with customers, leads, and prospects, including commercial negotiations;
- Pricing, including negotiated special pricing, negotiated one-time buy pricing, negotiated customer-specific pricing; and
- Hercules' formulary (inventory), including manufacturer identities, product names, dosage forms, strengths, and dosages.

43.     Trade secrets of the kind that Brant had access to and possession of during his employment (many of which he continues to have access to and possesses) are vital to Hercules' ability to fairly compete for business in the wholesale distribution market. Given the dominance of the Big Three, Hercules requires the benefit of every possible competitive edge it can muster and providing a competitor with this information would provide an unfair competitive business advantage.

44.     Hercules invests heavily in the generation of its trade secrets and confidential commercial information. This includes hard-won goodwill with customers, cultivated over many

years of careful relationship building and internal analysis.

45.     Hercules also invests heavily in security and protective measures intended to ensure that Hercules' trade secrets and confidential commercial information remain confidential. This includes the use of non-disclosure agreements with employees, suppliers, customers, and contractors; the use of non-compete agreements with certain employees and certain customers; technology monitoring; physical safeguards in offices; policies, procedures, and protocols relating to confidentiality; and more. Thus, Brant knew the sensitivity of the information he obtained and used, including that the customers themselves required Hercules to keep their shared information confidential.

**The Circumstances of Brant's Departure**

46.     On August 1, 2024, around 5:30 pm, Brant met with Amani and Michelle Sokoli ("Sokoli"), Hercules' Director of Human Resources, in Amani's office. Brant said that while he had not actively been soliciting employment offers, he received one from a competitor that included a $425,000 base annual salary, an unspecified equity stake, and commissions based on the gross margins between the competitor's acquisition cost and the competitors' sales price. He confirmed he was resigning and was not seeking a counteroffer from Hercules. Sokoli escorted Brant to his desk to collect his personal belongings and exit the building.  Brant's desk appeared to have already been organized for packing.

47.     Later that day Brant sent Amani a text message which, given all the information thus far uncovered by Hercules, appears to be a disingenuous attempt to suggest that he might have remained employed by Hercules.

48.     Indeed, Hercules came to learn that Brant had, over the two days prior to his resignation, approached colleagues at Hercules and disclosed: (i) he had been offered a position

12

with a New Jersey-based competitive wholesaler, NDC; (ii) his offer included cash and equity; (iii) he asked for, and received, a promise of protection from NDC regarding defense in an anticipated lawsuit; (iv) he had signed a contract with NDC; and (v) the timing of his departure was to enable him to represent NDC at a critical industry conference called the National Association of Chain Drug Store ("NACDS") Total Store Expo ("TSE") (together "NACDS TSE"), in Boston from August 17-19, 2024.

49.     Following Brant's resignation Hercules came to learn that on July 26, 2024, he had transferred highly confidential information from Hercules' email to his personal email (BHC@switched.com). The misappropriated information includes the following documents:

- **"Pricing Chart"** - Containing detailed information on usage per product and target buy price from a Hercules specialty customer. This document reveals sensitive usage and pricing information.

- **"Q3 Generics"** - Provides insights into usage per product and current buy price for one of Hercules' largest specialty customers. This document reveals sensitive usage and pricing information.

- **"Usage by Practice April"** - Shows the full usage and cost details for one of the largest specialty customers of Hercules. This document includes valuable data on customer usage patterns and associated costs.

50.     This information is strictly confidential and governed by individual NDAs. Brant was fully aware of such NDA agreements and that this information was shared by customers under conditions of strict confidentiality. This information is not public and holds significant value, as it enables competitors to identify specific products targeted for specific customers. Additionally, it discloses sensitive details such as the customer's current cost and target buy price.

51.     This insight could undermine Hercules' competitive position by revealing aspects of its pricing strategy and negotiating leverage with manufacturers. This is among the most sensitive confidential information Hercules possesses and is a blueprint that would enable Brant and NDC to unfairly compete against Hercules. Nor would Brant have any legitimate business need to have this information in his personal email. This is incredibly strong evidence that Brant took information with the intent of using it in violation of his common law, contractual and statutory obligations.

**The Need to Enjoin Brand from Working for NDC**

52.     For these reasons, Hercules asks the Court to enjoin Brant from working for NDC for the duration of his restricted period, extended for all days that he has been in breach of his Contract, and to issue an Order that he not take, use or disseminate any of Hercules' confidential information and trade secrets.

**The Need to Enjoin Brant from Attending the NACDS TSE**

53.     Trade shows, trade associations and interest groups routinely involve a significant mix of Hercules' manufacturers and customers, as well as manufacturer and customer prospects. DBDs routinely mix with customers and manufacturers at trade shows and in trade associations. Hercules significantly invests in DBDs travelling the country to meet with customers and leads and cultivates beneficial relationships with those customers on an ongoing basis. Said succinctly, Trade Shows are an important part of Hercules' advertising.

54.     The upcoming (August 17-19) NACDS TSE is a prominent conference featuring many significant Hercules customers and manufacturers. Brant has attended it on Hercules' behalf in the past. It is an extremely important networking opportunity, and brings together some of the largest pharmaceutical manufacturers, wholesale distributors, pharmacies, and technology solution

providers. Many of the manufacturers in attendance are known to Brant to be Hercules suppliers and many of the pharmacies in attendance are known to Brant to be Hercules customers. Historically, this is a business building opportunity in the industry.

55.     Brant's mere presence at the NACDS TSE on behalf of NDC would itself be a form of solicitation prohibited by his Contract, given that it is an annual opportunity for customers to interact with important business contacts. Brant's presence at the conference, if he attends, is the functional equivalent of his advertising for NDC. The mere fact that Brant is there for NDC will attract interest and attention relating to why he left and what he is doing for NDC.

56.     Every person with whom he interacts becomes a fact witness in this litigation, as they will have relevant information as to what they and Brant spoke about.

57.     On August 5, an NACDS representative informed Hercules that "[Brant Cherne] is registering [for the NACDS TSE] with his new employer."

58.     His attendance as an NDC employee also draws his new employer deeper into this controversy, both as a director competitor or an entity that is aiding and abetting Brant's behavior.

59.     It is the detailed relationships that DBD's have with attendees of the NACDS TSE that makes Brant's presence so problematic.

**The Need to Examine Brant's Personal Cell Phone**

60.     After Hercules began its investigation into the circumstances of Brant's departure, it learned of evidence that Brant had been using his personal cell phone for business purposes. Given how other DBD's use their business cell phones, it appears that Brant used his personal cell phone to store sensitive corporate information, including customer and supplier data, contracts, terms, and pricing. This information is highly confidential and critical to Hercules' competitive position and remains in his possession. For this reason, Hercules seeks to obtain possession of

Brant's cell phone so that it can be forensically examined to determine what Hercules information remains in his possession, what information has been shared with NDC, and how he may have used that information for NDC and against Hercules' interests.

**The Further Need for Injunctive Relief**

61.     Brant understood that breaching his Contract would cause Hercules irreparable harm: "The restrictive covenants herein are necessary to protect the Employer's legitimate business interests in its Confidential Information, trade secrets and goodwill. The Employer's ability to reserve these for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer and that the Employer would be irreparably harmed if the Employee violates the restrictive covenants in this Agreement."

62.     If true, the fact that Brant sought and obtained economic protection from NDC in the event Hercules sued him is itself circumstantial evidence of an awareness that his employment by NDC was perilous.

63.     The amount of business that Hercules stands to lose due to Brant's actions for NDC is entirely indeterminate and unquantifiable, as the market contains many distributors, and it will be impossible to trace specific instances of lost business to NDC.

64.     Brant remains in possession of Hercules' trade secrets and confidential commercial information and will be working for Hercules' direct marketplace competitor. If Brant discloses or uses Hercules' trade secrets and confidential commercial information this disclosure will not be able to be undone, and Hercules will lose the competitive edge it received by virtue of those trade secrets and confidential commercial information. Hercules will not only lose the value of the investments it made in its trade secrets and confidential commercial information, but also the

business it would have generated but for Brant's disclosure of that information. Once disclosed, there is no un-disclosing it.

65.     The investments Hercules has made into generating and preserving its trade secrets and confidential commercial information are of significant magnitude but are unquantifiable and indeterminate. They involve direct monetary investments as well as years of cultivated interpersonal relationships.

66.     Hercules utilizes specific measures to protect its most confidential information, such as that involved here. This information password protected on its servers and the information provided to DBDs is itself firewall protected among DBDs to protect both Hercules' confidential information and customers' confidential information entrusted to Hercules pursuant to separate mutual nondisclosure agreements. In other words, even DBDs do not have transparency into each other's confidential information.

67.     Brant's actions in competing against Hercules will result in the loss of goodwill that Hercules to an extent that is unquantifiable and indeterminate. Some of this goodwill is directly attributable to the unique relationships Brant cultivated with Hercules' customers over his six years of employment.

**Brant's Response to Concerns Raised by Hercules**

68.     On August 2, 2024, outside counsel for Hercules sent a letter to Brant reminding him of the non-compete, confidentiality, and non-solicitation obligations.

69.     On August 9, 2024, counsel received a letter from Brant's attorney, acknowledging and responding to the August 2 letter. Importantly, Brant does not contest the enforceability of the covenants in the Contract and agrees to abide by them. He should have no objection to the Court entering an Order directing him to do so.

70.     Seeking clarification, counsel for Hercules requested (by email) that Brant identify his new employer and disclose whether he intends to attend the NACDS TSE. The email response from Brant's counsel refused to provide the requested information and took the position that Brant is merely restricted from "selling any service or product that Hercules offers." As discussed above, that does not appear to be the case and his employment by NDC appears to have a more nefarious purpose that presents immediate and irreparable harm to Hercules.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.)**

71.     Plaintiff repeats, reiterates, and realleges each allegation set forth in the foregoing paragraphs with the same full force and effect as if fully set forth at length herein.

72.     The DTSA defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

73.     As detailed above, Defendant had access to Plaintiff's trade secrets throughout his employment, including: proprietary compliance programs and protocols; methodologies and strategies to use in synthesizing supplier-facing and customer-facing commercial strategies to generate sales; market strategy know-how, in a highly complex marketplace; cross divisional trade strategy know-how; the identities of customer leads and prospects; strategic initiatives and plans for targeting same; market research and intelligence; customer usages, i.e., demand, differentiated by different drug products, and tracked over time; confidential communications with customers, leads, and prospects, including commercial negotiations; pricing, including negotiated special

pricing, negotiated one-time buy pricing, negotiated customer-specific pricing; and Hercules' formulary (inventory), including manufacturer identities, product names, dosage forms, strengths, and dosages.

74. Given Brant's thorough knowledge of such trade secrets, it is inevitable that he will use or disclose them in the course of his new role at NDC.

75. Moreover, in the week prior to resigning from Hercules, Brant forwarded emails to his personal email account containing: detailed information on usage per product and target buy price from a Hercules specialty customer, revealing sensitive usage and pricing information; insights into usage per product and current buy price for one of Hercules' largest specialty customers, revealing sensitive usage and pricing information; and the full usage and cost details for one of Hercules' largest specialty customers, including valuable data on customer usage patterns and associated costs.

76. There was no reason for Brant to take this information unless he intends to disclose it to NDC or to use it in the course of his employment with NDC, either of which would be a violation of law.

77. The information that Brant has, upon information and belief, provided to NDC or threatens to provide to NDC regarding Plaintiff's strategic plans related to its products constitutes a trade secret within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

78. As detailed above, Plaintiff takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

79.     Defendant knew or should have known that Plaintiff's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Plaintiff at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Plaintiff's competitors; (e) would provide significant benefit to a competitor seeking to compete with Plaintiff; and (f) are critical to Plaintiff's ability to conduct their businesses successfully.

80.     As detailed above, Defendant transferred and/or wrongfully obtained and accessed Plaintiff's trade secrets and, upon information and belief, misrepresented to Plaintiff about having returned all the information, when in fact, he had not done so.

81.     As detailed above, Brant continued gathering Plaintiff's trade secrets even while he was obtaining employment with NDC. In fact, even after receiving an offer of employment from NDC in early August 2024, Brant nevertheless proceeds to maintain his LinkedIn profile reflecting that he was still employed by Hercules under the guise he is still representing Plaintiff post-resignation. Brant then had an abrupt exit interview, where he lied about returning all company property. The only purpose for Brant to obtain and retain Plaintiff's trade secrets is to use them to compete against Plaintiff on behalf of NDC.

82.     By disclosing and/or threatening to disclose Plaintiff's trade secrets to NDC without Plaintiff's consent, Brant has misappropriated or threatens to misappropriate Plaintiff's trade secrets, which includes Plaintiff's strategic business practices and methodologies that involve products that are sold in, utilized throughout, and/or travel through interstate commerce, in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

83.     The information that Brant has misappropriated or threatens to misappropriate

describes and relates to Plaintiff's strategic business practices and methodologies, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

84.     Should Brant continue to disclose or threaten to disclose Plaintiff's trade secrets, the disclosure of such information will harm Plaintiff and its legitimate business interests.

85.     Because Defendant's misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Plaintiff requests that this Court grant injunctive relief against Defendant from actual or threatened disclosure or utilization of Plaintiff's trade secrets, in addition to granting Plaintiff its attorneys' fees and exemplary damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Common Law Misappropriation of Trade Secrets)**

86.     Plaintiff repeats, reiterates, and realleges each allegation set forth in the foregoing paragraphs with the same full force and effect as if fully set forth at length herein.

87.     Plaintiff owns its Confidential Information, which encompasses highly sensitive and confidential trade secrets that Plaintiff invested years of time and considerable funds to develop and maintain.

88.     Plaintiff derives independent economic value from its Confidential Information not being generally known to, or readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

89.     Plaintiff has taken significant measures to maintain the secrecy of its Confidential Information, including restricting access to it.

90.     If information pertaining to Plaintiff's business, marketing, analytics and product pipeline strategies is divulged to the public, NDC, and/or other competitors of Plaintiff, it could destroy Plaintiff's competitive advantage.

91.     As described herein, Defendant improperly accessed and converted Plaintiff's

Confidential Information for his own use by improperly accessing and retaining the Confidential Information for his own, and his new employer's, benefit.

92.     By virtue of the foregoing conduct, Defendant misappropriated Plaintiff's trade secrets in violation of common law.

93.     As a direct and proximate result thereof, Plaintiff has been and will continue to be damaged in an amount to be determined at trial unless Defendant is enjoined from further misappropriation.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Breach of Contract)**

94.     Plaintiff repeats, reiterates, and realleges each allegation set forth in the foregoing paragraphs with the same full force and effect as if fully set forth at length herein.

95.     The Contract is a valid and enforceable written agreement between Plaintiff and Defendant.

96.     The restrictive covenants contained in the Contract remain in full force and effect, and for good consideration, Defendant remains obligated to comply with those restrictive covenants.

97.     Plaintiff satisfied all its material obligations under the Contract.

98.     Defendant has breached the Contract by accepting employment with NDC, a direct competitor of Plaintiff, in a competitive position.

99.     Defendant has also breached or plans to breach the Contract by violating its non-solicitation provisions.

100.    Defendant has also breached the Contract by retaining Plaintiff's property, including its Confidential Information that Defendant has not returned, and sharing Confidential Information with NDC.

101.     Defendant's actions have damaged Plaintiff's legitimate business interests and have denied it the benefit of its bargain with respect to the Contract.

102.     As a direct and proximate result of Defendant's actions described above, Plaintiff has suffered monetary damages, has suffered substantial and irreparable injury, and is threatened with further substantial and irreparable injury due to the loss and use by Defendant of its trade secrets, confidential information, and its goodwill, for which there is no adequate remedy at law to compensate Plaintiff. Such damages include without limitation Plaintiff's lost profits.

103.     By reason of the foregoing, Plaintiff requests the Court to grant preliminary and permanent injunctive relief. Plaintiff has no adequate remedy at law. Unless injunctive relief is granted, Plaintiff will be irreparably harmed in a manner not fully compensable by money damages.

104.     In the alternative, due to the foregoing, Plaintiff has been damaged in an amount determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty/Duty of Loyalty)

105.     Plaintiff repeats, reiterates, and realleges each allegation set forth in the foregoing paragraphs with the same full force and effect as if fully set forth at length herein.

106.     Plaintiff entrusted Defendant with access to confidential corporate information and placed him in a position of trust, thereby establishing a fiduciary relationship between Plaintiff and Defendant.

107.     As an employee of Plaintiff, Defendant owed Plaintiff a duty of loyalty to act in Defendant's best interests.

108.     By the acts described above, Defendant has breached his fiduciary duties, including his duty of loyalty to Plaintiff.

109.    By the conduct alleged herein, including forwarding Confidential Information to a personal email account in anticipation of resigning his employment, Defendant has materially breached and continues to breach his fiduciary duties and duty of loyalty to Plaintiff, specifically by improperly utilizing Plaintiff's Confidential Information to unfairly compete with Plaintiff.

110.    As a result of Defendant's wrongdoing, Plaintiff has suffered monetary damages and have suffered substantial and irreparable injury and are threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

111.    By reason of the foregoing, Plaintiff requires injunctive relief. Unless injunctive relief is granted, Plaintiff will be irreparably harmed in a manner not fully compensable by money damages. In addition, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Declaratory Relief)

112.    Plaintiff repeats, reiterates, and realleges each allegation set forth in the foregoing paragraphs with the same full force and effect as if fully set forth at length herein.

113.    An actual controversy exists as to the enforceability of the non-competition provision in the Contract and its applicability to Defendant's employment at NDC. Plaintiff believes that employment violates the non-competition provision while, on information and belief, Defendant disputes that.

114.    By reason of the foregoing, Plaintiff requests that the Court enter an order declaring the non-competition provision to be fully enforceable and construing it as prohibiting Brant's proposed employment with NDC.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Unfair Competition)**

115.    Plaintiff repeats, reiterates, and realleges each allegation set forth in the foregoing paragraphs with the same full force and effect as if fully set forth at length herein.

116.    Defendant was paid substantial sums of money by Plaintiff, provided crucial business development efforts to garner business to identify and target further clients for Plaintiff, along with addresses such clients' needs, and given a robust expense account to obtain and maintain such client relationships and business for Plaintiff's benefit.

117.    Defendant was paid in excess of $700,000 by Plaintiff last year and was the highest paid employee at Hercules.

118.    The goodwill in the relationships Defendant has solicited, accepted business from and services belong to Plaintiff, including, *inter alia*, because Defendant had no pre-existing client relationships.

119.    Defendant, as a Hercules employee, used this status, along with his access to Hercules' trade secrets and Confidential Information, to benefit NDC, Hercules' direct competitor, all for Defendant's personal gain.

120.    Therefore, Defendant has engaged in unfair competition.

121.    Defendant's actions were and are extreme and outrageous, and have been undertaken maliciously, deliberately, and with the willful intent to cause harm to Plaintiff.

122.    Upon information and belief, Defendant continues to speak with, divert, agree to meet with and serve the clients whose business was improperly diverted from Plaintiff.

123.    By reason of the foregoing, Plaintiff is entitled to recover compensatory and punitive damages for unfair competition in an amount presently incalculable and to be determined at trial, but which exceeds the jurisdictional minimum of this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all uses triable by right of jury.

**WHEREFORE**, Plaintiff Hercules Pharmaceuticals, Inc. demands judgment in its favor against Defendant Brant Cherne as follows:

A. Preliminarily and permanently enjoining Brant, and anyone acting in concert with him, from using or disclosing Confidential Information, as defined by the common law, and in the Employee Confidentiality and Non-Compete Agreement executed by Brant and Hercules on or about April 21, 2022;

B. Preliminarily and permanently enjoining Brant from working for NDC Distributors LLC until the earlier of August 1, 2025, or further order of this Court;

C. Preliminarily and permanently enjoining Brant from engaging in any Prohibited Activity, as defined by the Contract, until the earlier of August 1, 2025, or further order of this Court;

D. Preliminarily and permanently enjoining Brant, and anyone acting in concert with him, from directly or indirectly soliciting, contacting, or attempting to solicit or contact, any customers of Hercules in any matter prohibited by the Contract, until the earlier of August 1, 2025, or further order of this Court;

E. Requiring Brant to provide Hercules with copies of any Confidential Information in his possession, custody, or control;

F. Awarding compensatory damages and exemplary damages equal to two times the compensatory damages awarded pursuant to the DTSA and reasonable attorneys' fees dur to Defendant's violation of the Defend Trade Secrets Act of 2016;

G. Awarding compensatory and punitive damages due to Defendant's misappropriation of

26

Plaintiff's Confidential Information;

H.  Awarding compensatory damages to Plaintiff due to Defendant's breach of his Contract with Plaintiff;

I.  Awarding compensatory, punitive damages, and the disgorgement of all amounts earned by Defendant during periods of disloyalty due to Defendant's breach of his duty of loyalty and duty of loyalty owed to Plaintiff;

J.  Declaring that the non-compete in the Contract is enforceable and that Defendant's employment at NDC is a violation of such provision;

K.  Awarding compensatory and punitive damages due to Defendant's unfair competition;

L.  Awarding damages, including compensatory and exemplary damages, in an amount to be determined at trial; and

M.  Granting such other and further relief as this Court deems just, equitable and proper.

Dated: New York, New York
August 14, 2024

**TARTER KRINSKY & DROGIN LLP**

By:   *s/ Richard C. Schoenstein*
     Laurent S. Drogin
     Richard C. Schoenstein
     Brittany K. Lazzaro
     1350 Broadway
     New York, New York 10018
     Tel.: (212) 216-8000
     Email: ldrogin@tarterkrinsky.com
     Email: rschoenstein@tarterkrinsky.com
     Email: blazzaro@tarterkrinsky.com

*Attorneys for Plaintiff - Hercules Pharmaceuticals, Inc.*