**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
**HERCULES PHARMACEUTICALS, INC.**     **24-Cv-5659 (JS)**

               **Plaintiff,**

-against-

**BRANT CHERNE,**

-------------------------------------------------------X

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION UNDER FRCP 65

**Milman Labuda Law Group PLLC**
**3000 Marcus Ave**
**Suite 3W8**
**Lake Success, NY 11042**

## PRELIMINARY STATEMENT

Defendant Brant Cherne "Defendant" submits this memorandum in opposition to Plaintiff Hercules Pharmaceuticals, Inc. motion for injunctive relief.

The application must be denied because Plaintiff's submission fails to establish the heightened evidentiary standard for injunctive relief.  Plaintiff has not identified a trade secret recognized by the courts and has failed to offer anything more than speculative statements insufficient to establish irreparable harm.

Defendant has had less than 24 hours to prepare this response and resrvers all rights to supplement its defense.

## LEGAL STANDARD

The Second Circuit has long established that a party seeking a preliminary injunction must show three things: (1) irreparable harm in the absence of an injunction pending resolution of the action, (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (3) that a preliminary injunction is in the public interest. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). Courts apply the same standard when considering an application for a TRO. See e.g., *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020); Coronel v. Decker, 449 F. Supp. 3d 274, 280 (S.D.N.Y. 2020). Moreover, "a preliminary injunction is an extraordinary remedy never awarded as of right." Benisek v. Lamone, 138 S. Ct. 1942, 1943 (2018) (per curiam).

## POINT I

## PLAINTIFF CANNOT ESTABLISH IRREPRABLE HARM

Demonstrating irreparable harm is "the single most important prerequisite for the issue of" a temporary restraining order. *Faively Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

(2d Cir. 2009) (internal citation omitted). While a businesses' "loss of reputation and goodwill constitutes irreparable harm". *Really Good Stuff, LLC v. BAP Investors, LLC*, 813 F. App'x 39, 44 (2d Cir. 2020) (citing Register.com, Inv. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004))), the "loss of trade secrets and client relationships does not establish irreparable harm absent a showing that there is an imminent risk of dissemination of trade secrets and that plaintiff's injuries are not compensable through an award of damages." *See Faiveley*, 559 F.3d at 119 ([W]here there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages.'" (quoting *Geritrex Corp. v. Dermarite Indus., LLC,* 910 F.Supp. 955, 966 (S.D.N.Y. 1996))).

A.     **Plaintiff is unable to establish that Defendant and Plaintiff are direct competitors.**

Relevant here, to establish irreparable harm, Plaintiff must show that Defendant is a direct competitors of Plaintiff, which it cannot show. *See Cenveo Corp. v. Diversapack LLC*, 2009 Dist. LEXIS, *28 (S.D.N.Y. Oct. 1, 2009) ("Here, [plaintiff] concedes that [defendant] is not a direct competitor and has not alleged misappropriation of trade secrets, clients, or confidential information. Without such claims, [plaintiff] has not made a clear showing of irreparable harm"); *Rensselaer Polytechnic Inst. v. Appl Inc*., 2014 U.S. Dist. LEXIS 5186, *25 (N.D.N.Y. Jan 15, 2014) ("the parties are not direct competitors, as neither RPI nor Dynamic practices the '1793 Patent, there is little risk that the plaintiff will suffer irreparable harm through the continued use of accused technology that cannot be compensated through monetary relief"); see also Semiconductor *Energy Lab. Co. v. Chimei Innolux Corp.*, 2012 U.S. Dist. LEXIS 186322, *10 (Cal. C.D.C. Dec. 19, 2012) (finding that the plaintiff would not suffer damage to its revenues because it is not a direct competitor of the defendants.)

Here, NDC Distributors is not an equal or direct competitor to Hercules, Hercules is focused on the sale and distribution of specialty medicines, and NDC distributors is focused on the sale and distribution of traditional medicines.[1]

### B.    Plaintiff's theoretical irreparable harm is insufficient.

"[I]f a party fails to show irreparable harm, a court need not even address the remaining elements" of the preliminary injunction standard. *Coscarelli v. ESquared Hosp. LLC*, 364 F.Supp.3d 207, 221 (S.D.N.Y. 2019). "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Uni-World Capital L.P. v. Preferred Fragrance, Inc*., 73 F.Supp.3d 209, 236 (S.D.N.Y. 2014); *see also Shepard Indus*. v. 135 E. 57th St., LLC, 1999 U.S. Dist. LEXIS 14431, *24-25 (S.D.N.Y. Sept. 15, 1999) (vacating preliminary injunction because plaintiff only asserted conclusory allegations of irreparable harm). *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 U.S. Dist. LEXIS 86997, 2022 WL 1525486, at *6 (E.D.N.Y. May 13, 2022), reconsideration denied, No. 22-CV-1032 (PKC) (JRC), 2022 U.S. Dist. LEXIS 114267, 2022 WL 2316137 (E.D.N.Y. June 28, 2022).

In *Faiveley Transp. Malmo AB v. Wabtec Corp*., the Second Circuit found that the plaintiff had failed to provide any evidentiary support of irreparable harm, because the plaintiff was unable to show that despite using plaintiff's proprietary information for twelve years to manufacture products, the plaintiff was unable to provide any evidentiary support that the defendant was disseminating plaintiff's trade secrets. 559 F.3d 110 (2d Cir. 2009). Accordingly, the Second Circuit reversed the District Court's granting of a preliminary injunction due to the absence of any evidentiary support that the proprietary information as to be disseminated. Id.

---

[1] Factual statements as this have been provided to counsel by Defendant who will be a witness tomorrow to substantiate these statements.

Similarly, in *Shepard Indus.,* the temporary injunctive relief ordered by the Court and agreed to and extended by the parties was vacated because the plaintiff's "pleadings, affidavits, and exhibits consist[ed] only of conclusory allegations of harm to its goodwill or reputation in the absence of a preliminary injunction." 1999 U.S. Dist. LEXIS 14431, at *24. The Court further found that the plaintiff failed to allege it faced imminent financial ruin and that its damages would be easily calculable at trial, sufficient to find that the plaintiff failed to show a sufficient threat of irreparable harm. Id.

On this record, Plaintiff's submission in support of this application is woefully deficient in attempting to establish irreparable harm. In fact, its entire application can be distilled into the following: Defendant sent himself three documents about three customers that included pricing and related information for those customers only. Complaint ¶¶ 49-50. Plaintiff does not identify whether the customers have been solicited by Defendant and does not allege that those customers have stopped purchasing from Plaintiff. Plaintiff does not identify whether the unique information related to those three customers has been used in any way to solicit any other customer. Plaintiff does not indicate that even was contacted by those customers by Defendant.

Plaintiff does not explain how the pricing and "usage patterns" unique to those three companies is relevant to any other customer of Plaintiff or how, in fact, the pricing and "usage patterns" of those three companies would "undermine" "pricing strategy and negotiating leverage with *manufacturers*." Plaintiff attempts to fill the glaring hole by uttering the standard speculative phrase common in these sorts of deficient applications: "This insight could undermine Hercules' competitive position by revealing aspects of its pricing strategy and negotiating leverage with *manufacturers*." Complaint ¶ 51. Plaintiff has not identified whether such undermining has even occurred. Plaintiff has not bothered to allege with any support that Defendant was aware of

Hercule's manufacturing cost for the "specialty drugs" for those three customers to even approach the manufacturers to try and get them to produce the drugs at a lower cost. Indeed, Plaintiff has not identified any manufacturer that was contacted by Defendant or has offered to produce a "specialty drug" at a lower cost for NDC than for Hercules. It must be understood that Defendant is not selling to end user customers – he is focused on developing relationships with manufacturers to purchase product wholesale. There is no allegation that he is aware of the pricing arrangement between Hercules and any manufacturer let alone those that produced the drugs for the three customers. Plaintiff also fails to explain let alone support how knowing retail price equates to knowledge of the cost price Hercules paid the manufacturer. Plaintiff has not alleged Defendant is in possession of that information to allegedly undermining its relationships with manufactures. In other words, knowledge of end user market price does not equate to knowledge of cost price to Hercules. This application must be denied.

Again, Defendant retained pricing information for three customers and Plaintiff has not shown any actual harm flowing from that act. Thus, even retaining such limited information it does not follow that such conduct will actually and imminently incur harm that is in fact "irreparable." *Freedom Holdings*, 408 F.3d at 114. That is, the potential for irreparable harm here—i.e., the destruction of Plaintiff's entire business and good will—is more akin to a "possibility" on the sworn allegations put forth; no other factual allegations are proffered that Defendant's conduct will actually result in an amount of sales that would have otherwise gone to Plaintiff such that it would destroy Plaintiff's business in its entirety. In sum, Plaintiff's theory of imminent harm is premised on an "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013). It is well established that courts cannot issue a TRO on the basis of a mere possibility. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S. Ct.

365, 172 L. Ed. 2d 249 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Absent evidentiary support that Defendant is or will disseminate or use the "pricing" and "usage patterns" of those three customers, there is no basis for this Court to enter a preliminary injunction against Defendant. See *Faiveley*, 559 F.3d 110 (2d Cir. 2009). Even if there was such evidence loss of market share is not 'imminent harm' sufficient to warrant injunctive relief. Freedom Holdings, 408 F.3d at 115.

Similarly, while Plaintiff contends that Defendant was given access to a multitude of "proprietary information" Plaintiff has not identified whether Defendant has retained any such information and certainly not provided a scintilla of evidence that such "proprietary information" is being utilized and has caused any harm. This claim fails the heightened injunctive relief standard.

### B.    Plaintiff can be compensated through money damages.

Where "there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consolidated Edison Co. of New York, Inc.*, 409 F.3d 506 (2d Cir.2005); *IME Watchdog, Inc*, 2022 U.S. Dist. LEXIS 86997, 2022 WL 1525486, at *6 (money damages providing adequate compensation do not allow for a TRO).

In Biocon Ltd. v. Abraxis Bioscience, Inc., the Southern District Court found that a loss of customers could be compensated through monetary damages. *Biocon Ltd. v. Abraxis Bioscience, Inc.,* 2016 U.S. Dist. LEXIS 139211, *13 (S.D.N.Y. Sept. 26, 2016).

Even if Plaintiff had any evidence that a manufacturer stopped selling to Hercules or that a single customer left Hercules and now purchases from NDC, such damages would be recoverable as money.  Plaintiff's submission does not provide any substantiation of how money damages would be insufficient and the claim fails on this standard.

### C.      Plaintiff has failed to address that it would be required to post a bond.

Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The allegations contained in the Complaint, as demonstrated herein, are frivolous and therefore a large bond must be posted. This is especially true as Plaintiff is requesting that this Court order Defendant to produce his cell phone for an invasive search, stopping working for NDC entirely and stop him from attending a conference.

## POINT II

## PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

Assuming *arguendo* that this Court does find that Plaintiff has established that it will suffer irreparable harm, which it should not, Plaintiff cannot establish a likelihood of success on the merits of any of their claims.

### A.  Plaintiff cannot establish the likelihood that it will prevail of its cause of action pursuant to the Defend Trade Secrets Act.

To prevail under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, Plaintiff is required to show that Defendants disclosed a trade secret without consent where either: (1) that secret was acquired by improper means; or (2) at the time of disclosure, Defendants knew or had reason to know that the secret was acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty. 18 U.S.C. § 1839(5).

Under this test, "improper means" includes misrepresentation and breach or inducement of the breach of the duty to maintain secrecy; it does not include where the information in question is "reverse engineer[ed]" or "independent[ly d]eriv[ed]". *Intertek Testing Servs., N.A., Inc. v. Pennisi,* 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020).

A trade secret is defined as "all forms and types of financial business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to and not being readily ascertainable through proper means by another person who can obtain eco value from the disclosure or use of the information . . ." 18 U.S.C. § 1839(3). The Second Circuit has previously found that "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected . . . against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." Plaza Motors of Brooklyn, Inc. v. Bogdasarov, No. 21-cv-6546 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021) (emphasis added) (quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999). In addition, general and vague references to methods, processes, interpretation, programs, and data configuration protocols do not plausibly support the existence of a trade secret without supportive facts explaining, for example, how such strategies, techniques or models function, how Intrepid derives value from them, or what Intrepid specifically does to ensure their secrecy. *s,* 2018 U.S. Dist. LEXIS 10730, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018) (Holding that "[a]lleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue . . . does not give rise to a plausible allegation of a trade secret's existence.") (internal quotation marks and citation omitted) (emphasis in original).

While Plaintiff contends that Defendant was entrusted with a multitude of "trade secrets" there are several fatal problems with the allegation.

With respect to Complaint ¶ 3, tThe usage reports and volume reports in question are not trade secrets, because usage reports, purchasing patterns, and sometimes prices or target prices for products, are given to any and all vendors which have a desire to work with a pharmacy or create a partnership.

With respect to Complaint ¶¶ 12-14, On the National Association of Boards of Pharmacy ("NABP") website, their exist 756 Accredited drug distributors.  Some of which are duplicated from within the same organization.  The market is predominantly controlled by the big 3 wholesalers, but there is a large volume of secondary wholesalers that act in a very similar capacity to Hercules, and compete actively with Hercules.  There are no unique strategies or tactics implemented by Hercules.  All the potential buyers and customers exist in a public easily searchable capacity.  There is no magic item or strategy that Hercules uses to sell to customers, the simple fact is that if Hercules has the best price then Hercules gets the order and the business, if it does not obtain the best price required or requested, then the customer will go somewhere else to purchase the product, and then happened often.  There were no models, methods, or analytics shared with Defendant when it came to selling products to customers.   Defendant was simply tasked with finding customers, and try to sell them the drugs that Hercules had in our formulary, by trying to obtain the price by which they would acquire drugs from Hercules.  Pricing portal process.  There is no guidance provided to maximize their profitability, it was simply to state that if Hercules had the best price for them, then they could save money and drive economic value to their organization.  The process of working with a customer to purchase outside of their PVA and

to try to provide the best price possible for a customer is very common practice among all "secondary" or other non Big-3 distributors.

With respect to Complaint ¶ 15, there is no predictive trends, outcomes and breakthroughs in the specialty drug market for "ahead of the market", data that is not easily findable on the FDA website which is public information, additionally, there are paid sites like IQVIA and IPD analytics which many companies have access to which will provide estimated launch dates for drugs and generic drugs.  There is no proprietary knowledge that has been imparted to Defendant worthy of DTSA protection.

With respect to Complaint ¶ 17, the only information Defendant was given regarding Lenalidomide was that it was a REMS drug, and therefore not every customer was able to purchase it because they had to be in a REMS program.  The REMS program requirements are public information.  Defendant was not given a list of entities that were in the REMS  program to target. Defendant was told to try to find customers that were in the REMS program and used only publicly accessible information to try to contact customers and leads and asked if they were in the program. Once knowing they were in the REMS program, Defendant was only given an offer price to offer the customer, at which point they would determine if it was a good price and would move forward or if they would pass on the purchase opportunity.   Some customers decided to move forward, while others did not for reasons related to the offer price which Defendant had no ability to set. All prices were provided to Defendant by senior executive management and Defendant was to give the price to the customer.  Defendant acted as a middleman in offering prices.

With respect to Complaint ¶ 18, there is no "secret sauce" or trade secrets involved in identifying customers, and selling them the products in our warehouse, or prospective products we were trying to obtain.  There is no know-how that is unique in nature that would be different than

any other competitor.  Hercules' process of selling drugs is customary and usual to all non big-3 wholesalers.  Defendant's job simply was to identify entities that purchased specialty medicines, get them to sign an NDA, once an NDA was completed try to obtain a usage report with price guidance, and then to submit all gathered information into a pricing portal with customer screenshots if they existed.  Defendant then would wait for the pricing team to provide him with an offer price that Defendant can offer the customer.  Defendant had no involvement in the decision of prices offered, that was all reviewed by the pricing team and then decided with/by senior executive management approval.  Defendant was not privy to how they priced drugs.  If Defendant did not like an offer price or if the customer did not like an offer price provided, then Defendant can counter the offer price provided and ask the pricing team and senior executive management to reconsider, and then wait again for them to either provide an updated price or provide a "best and final" offer price.  Defendant would accept, temporarily accept, or reject an offer.  Even if a customer accepted or temporarily accepted an offer price, there was no binding agreement which required them to purchase.  It was just the process Hercules company used to try to get them an offer price.

None of what Plaintiff has described considering the foregoing can arguably be considered a "trade secret" sufficient to establish the heightened "probability of success on the merits" standard here and the motion for injunctive relief must be denied. Elsevier Inc. v. Doctor Evidence, LLC, 2018 U.S. Dist. LEXIS 10730, 2018 WL 557906, at *5 (SDNY 2018) (alleged trade secrets including growth initiative, clinical methods related to executing projects, data configuration protocols and methods, data interpretation, process to assess the quality of evidence and how to execute it, assessments of the risk of bias of the evidence based on funding source, analytics, analytics tools/programming, unique and proprietary process for binding collecting original terms

in publication and then binding like terms/synonyms to that original term, and embedded database field names, parameters and scheme information, were general categories of confidential information); Lawrence v. NYC Med. Practice, P.C., 2019 U.S. Dist. LEXIS 150408, 2019 WL 4194576, at *4-5 (SDNY 2019) (alleged trade secrets including patient coordination, signing up patients, methods for advertising and communicating with prospective patients, and stealing patient lists, were described at the "highest level of abstraction" and not adequate to plead existence of a trade secret.)

## B. Plaintiff cannot establish the likelihood that it will prevail of its cause of action for Common Law Misappropriation of trade secrets.

The elements of a misappropriation of trade secrets claim under New York common law "are fundamentally the same as those sustaining a claim under the DTSA." See Kraus USA, Inc. v. Magarik, No. 17-CV-6541, 2020 U.S. Dist. LEXIS 83481, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (internal quotations omitted). They require a plaintiff to show "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999). Therefore, for substantially the same reasons that the DTSA claim will fail, Hercules is not likely to succeed on this claim.

## C. Plaintiff cannot establish the likelihood that it will prevail of its cause of action for Breach of Contract.

To recover on a breach of contract claim under New York law, a plaintiff must demonstrate '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages.'" Goat Fashion Ltd. v. 1661, Inc., 2020 U.S. Dist. LEXIS 178636, 2020 WL 5758917, at *6 (S.D. N. Y. Sept. 28, 2020) (quoting Eternity

Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004)).

Hercules is not likely to succeed on this claim for a variety of reasons.

First, the agreement is unenforceable as being overbroad. even where an employer has been determined to have an interest in preventing a former employee with "unique or extraordinary" abilities from exploiting goodwill at the employer's expense, this employer interest "will not be construed as legitimate if the covenant 'seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment or if the covenant extends to personal clients recruited through the employee's independent effort.'" Poller v. BioScrip, Inc., 974 F. Supp. 2d 204, 216-17 (SDNY 2013).

The definition of Prohibited Activity here is unreasonable because it essentially precludes him from working in the industry. To wit,

> Prohibited Activity" is activity in which the Employee contributes their knowledge (whether directly or indirectly, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity) to an entity engaged in any business that competes with Employer, by selling any product or service sold by Employer. Prohibited Activity also includes activity that may require or inevitably require disclosure of Confidential Information does not include "manufacturer" in its definition of entities that Defendant is prohibited from working with.

See Dkt 4-4.  Noncompete provisions such as the one here are unreasonable and therefore unenforceable. 24 Seven, LLC v. Martinez, 2021 U.S. Dist. LEXIS 15480, *47-48 (SDNY 2021) ("Plaintiff's noncompete provision does not merely prohibit Martinez from soliciting clients that she built goodwill with through 24 Seven's resources, but, as Judge Rakoff points out, extends to "many of the biggest clients in her industry.")

Second, similarly showing unreasonableness, the agreement does not prohibit. Defendant was a "front of the house" salesperson of manufactured products to end users for Hercules.  Defendant did not sell to Hercules' manufacturers and did not negotiate

wholesale prices. The agreement here for enforcement prohibits conduct for which Defendant did not perform for Plaintiff thereby rendering him unemployable in the industry. This is too far.

Third, Plaintiff has not performed as it should have. The agreement states that "WHEREAS, the Employee desires to give, and Employer desires to receive from Employee, certain promises and restrictive covenants in connection with Employee's employment." Dkt. 4-4. Defendant has a commission plan that was in effect at the time of the execution of het agreement. The commission structure was modified after execution. Specifically, after already engaging with customers and getting them to confirm that they would want it, on July 2022, Defendant was told that the commission for this product would be 0.5% for the first $5mm sold per month, and then 0.25% for any additional volume, and there was no room for discussion. Hercules refusal to honor the pre-existing commission structure post-execution of the agreement constituted breach by Plaintiff relieving further performance by Defendant.

Fourth, Plaintiff has not identified any damages to establish the likelihood of success heightened standard at this juncture. There is not a single customer identified that has left or manufacturer that no longer will sell to Plaintiff. The alleged "irreparable harm" is purely speculative as set forth *supra*.

### D. Plaintiff cannot establish the likelihood that it will prevail of its cause of action for Breach of Fiduciary Duty/Duty of Loyalty.

Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011) (citing Barrett v.

Freifeld, 64 A.D.3d 736, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)). Under New York law, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." William Kaufman Org., Ltd. v. Graham & James LLP, 269 A.D.2d 171, 703 N.Y.S.2d 439, 442 (1st Dep't 2000). Breach of fiduciary duty and breach of contract claims are duplicative where they "are premised upon the same facts and seek the same damages for the alleged conduct." N. Shipping Funds I, LLC v. Icon Cap. Corp., 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013).

Even assuming Plaintiff has alleged sufficient facts to plead the existence of a fiduciary duty between Defendant and Plaintiff by virtue of Defendant's employment, Plaintiff's claim for breach of that duty is "based upon the same facts and theories as [its] breach of contract claim." Brooks v. Key Trust Co. Nat. Ass'n, 26 A.D.3d 628, 809 N.Y.S.2d 270, 272 (3d Dep't 2006).

Plaintiff's claim is identical in substance to its breach of contract claim and is therefore duplicative. See, e.g., Najjar Grp., 2017 U.S. Dist. LEXIS 29200, 2017 WL 819487, at *5 (dismissing breach of fiduciary duty claim as duplicative where "the allegations supporting [p]laintiff's fiduciary duty claim ... are 'either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith'" (quoting Brooks, 809 N.Y.S.2d at 272)); Uni-World Cap., L.P. v. Preferred  Fragrance, Inc., 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (dismissing fiduciary duty claim as duplicative of breach of contract claim where "plaintiffs [did] not allege or point to a single fact supporting the proposed breach of fiduciary duty claim that [was] not [**36]  already included in the proposed breach of contract claim").

**E.  Plaintiff cannot establish the likelihood that it will prevail of its cause of action for Unfair Competition.**

Pursuant to New York law, a claim for unfair competition is predicated upon "the alleged bad faith misappropriation of a commercial advantage belonging to another by exploitation of proprietary information or trade secrets." Weil v. Stenzler, 2019 N.Y. Misc. LEXIS 1751 (Sup. Ct. N.Y. Cnty. Apr. 5, 2019) (internal citations omitted). Thus, in order to establish a claim for unfair competition, Plaintiff is required to establish that (1) it possessed a trade secret; (2) Defendant(s) used that trade secret in breach of an agreement, confidential relationship, or duty, or as a result of discovery by improper means; and (3) Defendant(s) engaged in bad faith misappropriation of a commercial advantage belonging exclusively to Plaintiff. See Schroeder v. Pinterest Inc., 133 A.D.3d 12 (1st Dept 2015); Weil, 2019 N.Y. Misc. LEXIS 1751. Moreover, "[u]nder New York law, damages is an essential element of unfair competition claims." eCommission Sols, Inc. v. CTS Holdings Inc., 860 Fed. Appx. 758, 760 (2d. Cir. 2019) (granting summary judgment to defendant because plaintiff failed to provide any admissible evidence to support its claim that defendant's use of plaintiff's pricing and customer list caused a loss of business to plaintiff); see also Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C., 136 A.D.2d 633, 523 N.Y.S.2d 875 (2d Dept. 1988) ("[T]he absence of sufficient allegation of special damages mandates the dismissal of the plaintiff's unfair competition and prima facie tort causes of action."). The damages alleged pursuant to an unfair competition claim must be directly traceable to the acts of unfair competition, and the "damages cannot be remote, contingent or speculative . . . . The standard is not one of mathematical certainty but only reasonable certainty." Id. (quoting E.J. Brooks Co. v. Cambridge Sec. Seals, 31 N.Y.3d 441, 80 N.Y.S.3d 162 (2018).

This claim fails for the reasons identified supra regarding the defective DTSA, misappropriation of trade secret and breach of contract claims. For example, there are no trade

secrets recognized by extant precedent and there are no identifiable damages, just speculative harm.

CONCLUSION

For the reasons stated above the required elements for injunctive relief under FRCP 65 are absent: i) no irreparable harm; ii) not likely to succeed on the merits; ii) balance of equities does not favor injunctive relief; and iv) no undertaking posted.


Dated: August 15, 2024   MILMAN LABUDA LAW GROUP PLLC
           /s/
         Robert F. Milman, Esq.
         Jamie S. Felsen, Esq.
         Michael J. Mauro, Esq.
         3000 Marcus Ave.
         Suite 3W8
         Lake Success, NY 11042
         (516) 328-8899
         rob@mmmlaborlaw.com